NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

23-P-46

COMMONWEALTH

vs.

ELENA KURBATZKY.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

After a jury trial, the defendant, the sole owner of Harmony Home Health Care, LLC (Harmony), was convicted of three charges of medical assistance fraud, in violation of G. L. c. 118E, § 40; one charge of medical assistance fraud, in violation of G. L. c. 118E, § 39; and three charges of larceny over $250, in violation of G. L. c. 266, § 30 (1), as amended through St. 1987, c. 468, § 1. Over a year and a half later, she filed a motion for a new trial arguing that she had been incompetent to stand trial. After a three-day hearing at which three mental health experts testified, the motion judge, who was also the trial judge, denied the motion. He also denied the defendant's motion to reconsider. The defendant's appeal from

her convictions was consolidated with her appeal from the denials of her motion for a new trial and motion to reconsider. We affirm.

The defendant maintains here, as she did in her motion for a new trial, that her mental illness rendered her incompetent to stand trial at the time of trial and during pretrial proceedings.[1] Her other challenges relate to pretrial and trial issues described below.

Background. 1. Facts underlying charges. In the light most favorable to the Commonwealth, the following evidence was established at trial. See Commonwealth v. Latimore, 378 Mass. 671, 677 (1979). The defendant was a registered nurse and the sole owner of Harmony. Harmony operated as a home health agency and was a provider for MassHealth, the Commonwealth's Medicaid program. From February 2015 until October 2016, the defendant submitted claims to MassHealth on behalf of Harmony for patient

---

[1] The defendant's standby counsel and the Commonwealth moved in the Superior Court to impound the defendant's mental health evaluations related to her motion for a new trial. The defendant herself opposed those motions, "urging that the proceedings in her case be in the public file, to promote transparency." The judge denied the motions for impoundment. In light of the defendant's position, we have included her full name in the case caption and have not restricted our discussion of her mental health evaluations herein. See G. L. c. 123, § 36A ("all reports of examinations made to a court pursuant to [G. L. c. 123, §§ 1-18, 47, 48] shall be kept private except in the discretion of the court").

services that were not authorized by a physician, which is against regulation. The defendant also submitted claims for services that were never provided, and she submitted claims with inaccurate modifier codes resulting in overpayments. The defendant also submitted claims on behalf of herself as a purported Harmony patient; these services had not been authorized by a physician. In total, Harmony and the defendant received over $3 million from MassHealth based on fraudulent claims.

2. Pretrial proceedings. During pretrial proceedings, the defendant discharged several appointed attorneys and standby counsel. On October 24, 2017, a judge of the Superior Court conducted a colloquy with the defendant and allowed her to represent herself without standby counsel. On March 9, 2018, after the defendant filed forged paperwork with the Superior Court clerk's office leading to subsequent charges for uttering a false writing (uttering case), another judge ordered a competency evaluation pursuant to G. L. c. 123, § 15 (a).

On the same date, Dr. Heather Jackson interviewed the defendant and conducted a competency evaluation. In her report, Dr. Jackson concluded that "[w]hile [the defendant] described some general overarching paranoia regarding the legal system and potential conspiracies, it did not appear to be causing significant deficits in her competency related abilities." Dr.

3

Jackson advised that the defendant could benefit from the appointment of standby counsel to assist "with more complex legal processes and a potential trial."

3. Posttrial competency evaluations related to uttering case. Eight months into her incarceration, on April 17, 2019, the defendant was ordered by a judge in her uttering case to undergo a competency evaluation pursuant to G. L. c. 123, § 15 (a). The evaluator, Dr. Jodie Shapiro, concluded that as a result of "her fixed ideas about her cases or due to her paranoid and illogical beliefs about her case," the defendant "present[s] with competence-related deficits," and recommended further evaluation. On June 7, 2019, the defendant was evaluated for competency by Dr. Ingrid Li on an inpatient basis pursuant to G. L. c. 123, § 15 (b). Dr. Li opined that the defendant was "exhibiting significant deficits" in competency-related abilities, but did not require psychiatric hospitalization. Dr. Li further stated that while the defendant "had a factual understanding of the proceedings against her, [she] did not have a rational understanding and would have difficulty consulting with an attorney." Dr. Li believed the defendant's presentation was most consistent with a personality disorder.

On September 16, 2019, after meeting with the defendant again, Dr. Shapiro provided an updated competency report and

4

opined that the defendant had "significant competence related deficits due to the symptoms of her mental illness." On November 18, 2019, the judge in the uttering case found the defendant incompetent to stand trial. Two further competency evaluations in November and December 2020 determined that the defendant was still not competent to stand trial.

Discussion. 1. Past competence to stand trial. "A motion for new trial is addressed to the sound discretion of the judge." Commonwealth v. Moore, 408 Mass. 117, 125 (1990). Such a motion is "granted only in extraordinary circumstances." Commonwealth v. Comita, 441 Mass. 86, 93 (2004). It is the defendant's burden to prove "facts upon which [she] relies in support of [her] motion for a new trial." Commonwealth v. Chatman, 466 Mass. 327, 333 (2013). "A trial judge is entitled to rely on [his] knowledge of what occurred at trial when ruling on a motion for a new trial." Id. at 333-334. "Where, as here, the motion judge [was] also the trial judge, we give 'special deference' to the judge's findings of fact and . . . decision on the motion" (citation omitted). Commonwealth v. Kolenovic, 471 Mass. 664, 672-673 (2015).

It is well settled under both the Fourteenth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights that, "a person whose mental condition is such that he [or she] lacks the capacity to understand the

5

nature and object of the proceedings against him [or her], to consult with counsel, and to assist in preparing his [or her] defense may not be subjected to a trial" (quotation omitted). Commonwealth v. Brown, 449 Mass. 747, 759 (2007). When competency is raised in a motion for a new trial, the defendant is required to "establish by a preponderance of the evidence that the Commonwealth would not have prevailed had the issue [of competency] been raised at trial." Chatman, 466 Mass. at 336. The "time frame for determining a defendant's competency to stand trial is the condition of the defendant at the time of trial" (citation and quotation omitted). Commonwealth v. Companonio, 445 Mass. 39, 50 (2005). "Because a postverdict motion requires a retrospective determination of the defendant's competency, 'the weighing process must necessarily place greater emphasis on evidence derived from knowledge contemporaneous with the trial.'" Commonwealth v. Chatman, 473 Mass. 840, 847 (2016) (Chatman II), quoting United States v. Makris, 535 F.2d 899, 907 (5th Cir. 1976), cert. denied, 430 U.S. 954 (1977).

There is no dispute that the defendant has been diagnosed as mentally ill due to a personality disorder.[2]  However, while the "presence or absence of a mental illness is informative on the question of competency," it is "not dispositive."  Chatman II, 473 Mass. at 847.  The "hallmark of a postverdict competency inquiry is the defendant's 'functional abilities.'"  Id. at 846, quoting Commonwealth v. Goodreau, 442 Mass. 341, 350 (2004).  Assessment of those functional abilities includes considering (1) whether the defendant has "sufficient present ability" to assist in her own defense "with a reasonable degree of rational understanding," and (2) whether she has "a rational as well as factual understanding of the proceedings."  Chatman II, supra at 847, quoting Commonwealth v. Harris, 468 Mass. 429, 443 (2014).

The judge analyzed the defendant's "functional abilities" at both the pretrial stage and during trial.  Goodreau, 442 Mass. at 350.  The judge credited Dr. Jackson's pretrial conclusion that, despite the defendant's paranoid beliefs about the legal system, her mental state "did not appear to be causing significant deficits in her competency related abilities."  This

---

[2] Although it was not until April 2019, approximately nine months after the defendant's conviction, that the defendant's mental illness was identified as a possible personality disorder, the parties appear not to dispute that personality disorders are enduring and typically present by late adolescence or early adulthood (long before the diagnosis here).

7

was the only evaluation performed during the relevant time period, and it was reasonable for the judge to place significant weight on this opinion. See Chatman II, 473 Mass. at 847.

Based on his review of the transcripts, the judge also made specific findings regarding the defendant's performance at important pretrial proceedings. For example, he noted that at the hearing on her motion to dismiss, the defendant made several legally unsound arguments. He concluded, however, that none of her behaviors evidenced "disabling mental illness" resulting in incompetency. Rather, her shortcomings merely reflected "inadequate legal training."

Regarding a May 15, 2018 hearing, the judge found that while the defendant "made several conspiratorial and paranoid statements . . . [she] was able to address the legal and factual issues when directed." He highlighted the defendant's presentation of legitimate issues, such as concerns about the competency of infirm witnesses and the basis of the Commonwealth's probable cause to search Harmony's records. The judge remarked that the defendant "presented those issues cogently and without evidence of a thought or processing disorder."

Noting that his involvement in the case began just prior to trial in July 2018, the judge concluded that based on his own observations of the defendant's pretrial behavior, while she

8

sometimes presented conspiratorial beliefs, she was, overall, "very organized, logical . . . processed the information," responded appropriately, and "generally demonstrated clarity of thought." He carefully detailed many examples of his pretrial interactions with her to support his conclusions.

The judge also appropriately placed significant weight on his own observations of the defendant's abilities during the trial itself. See Chatman II, 473 Mass. at 847. He first noted that on the morning of the first day of trial, he conducted a full colloquy regarding her decision to represent herself at trial and "[a]fter numerous questions and appropriate responses," he found that she was competent to represent herself. Based on his own observations, he ultimately concluded that:

> "Throughout the trial, [the defendant's] overall thought process was reasoned and organized, with some exceptions of course. She was polite to witnesses, largely focused her questions on topics relevant to the indictments against her, and generally complied with courtroom norms throughout the trial, especially in front of the jury. She responded in a measured, and even compassionate, way despite the obvious hostility expressed by some of the witnesses. Particularly significant is her ability to understand that she needed to consult with stand-by counsel on two occasions, which presented technical legal issues beyond her knowledge and training. She in fact did consult with standby counsel on those occasions. Those instances confirmed her understanding of the role of counsel, the existence of legal rules beyond her knowledge, and her willingness to consult an attorney to learn and follow those rules."

9

Turning to the posttrial proceedings, the judge found that of the three experts who testified at the hearing, only one, Dr. Mendoza, had read the trial transcript in depth.[3] Dr. Mendoza concluded that although the defendant "presents, at times, with extreme forms of grandiosity, aggressiveness, hypersensitivity, paranoia and quickly paced thoughts," from his review of the record, he saw "no evidence of disjointed, disorganized, [or] paranoid [thought]," and did not believe there was "substantial evidence to suggest that [she was] not competent to stand trial."[4] In support, Dr. Mendoza cited numerous examples of the defendant's reasonable decision-making and rational actions she took throughout the proceedings, both pretrial and at trial.

---

[3] There was no clear error in the judge's finding that Dr. Mendoza "was the only expert to read the trial transcript in depth (or, perhaps, at all)." The judge acknowledged that the defendant's expert, Dr. Paul Nestor, had reviewed the trial transcript, and further clarified in his order denying the motion to reconsider that he believed Dr. Nestor had not reviewed the transcript in "any depth." The judge also stated that he had not disregarded Dr. Nestor's testimony. Thus the record does not support the defendant's contention that the judge "reject[ed]" Dr. Nestor's testimony on false grounds that he failed to review the trial transcript.

[4] Despite the defendant's argument to the contrary, that Dr. Mendoza did not provide a definitive opinion on the defendant's competency at the time of trial and Dr. Nestor did make such a conclusion, the evidence was not "in equipoise." Dr. Mendoza did not opine on the defendant's competency because, as he testified, based on "[g]uidelines, ethics, codes of conduct" it would be inappropriate for him to make such a determination without having examined the defendant at the relevant time.

Even the defendant's expert,[5] Dr. Paul Nestor, opined that the defendant "performed adequately" at trial, and that her conduct "showed evidence of a degree of rational understanding of the criminal proceedings."  Dr. Nestor also acknowledged that the defendant's decision to consult with the duty attorney twice during trial could support a finding that she trusted the advice she had received the first time and valued the input from the attorney.

The evaluations concluding the defendant was incompetent to stand trial dated from eight months to two years after her trial.  Significantly, as the judge found, following the defendant's convictions in this case, she "suffered considerable external stressors, including incarceration, loss of custody of a child, and financial hardship."  Such "stressors could have impacted the [defendant's] clinical presentation and, at a minimum, make it inappropriate to assume that the conclusions of post-trial evaluators demonstrate incompetency to stand trial at the earlier time of pre-trial proceedings and the trial itself."  Indeed, all three experts acknowledged that, in general, stress

_____

[5] The defendant's other expert, Dr. Jeffrey Burl, interviewed the defendant more than two years after trial.  He gave no opinion about her competency during the relevant time period, and other than seeing some excerpts attached to the motion, he did not review the trial transcripts.  Accordingly, his report and testimony added little to the analysis of whether the Commonwealth could have met its burden at the relevant time.

11

could exacerbate functional impairments in those with personality disorders.

Thus, based on his review of the record, his own observations, and informed by the reports and testimony of experts, the judge reasonably concluded that the defendant failed to establish by a preponderance of the evidence that the Commonwealth would not have been able to meet its burden to show competency had the issue been raised prior to or at trial. See Chatman II, 473 Mass. at 854. We discern no error or abuse of discretion in the judge's assessment.

2. Sufficiency of evidence. The defendant maintains that the evidence was insufficient to support her convictions on the three indictments charging medical assistance fraud under G. L. c. 118E, § 40. Specifically, she challenges the evidence that she was a "provider" with respect to charges 1 and 3 (the felony offense within G. L. c. 118E, § 40) and that she was a "non-provider" (with respect to charge 2, the misdemeanor offense within the statute). We disagree.

When reviewing the sufficiency of the evidence, the "question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Latimore, 378 Mass. at 677, quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979).

12

For the felony convictions, the Commonwealth needed to prove that the defendant was a provider who knowingly submitted false claims to MassHealth for home health services that were not authorized by a physician (charge 1), and knowingly submitted false claims to MassHealth by failing to use appropriate modifier codes (charge 3).  G. L. c. 118E, § 40. Contrary to the defendant's argument on appeal, her status as a provider[6] did not vary depending on whether the specific service for which she was fraudulently submitting a claim had actually been provided.  Rather, proving that the defendant was a provider as defined in G. L. c. 118E, § 40, required showing that she was "a person who furnishes [home health services]" during the time when the fraudulent activity took place, which the Commonwealth did.  See G. L. c. 118E, § 40.  See also G. L. c. 118E, § 8 (defining "provider" as "any institution, agency, individual, or other legal entity qualified under the laws of the commonwealth to perform the medical care or services for which medical assistance and medical benefits are available under this chapter").  We find no support in the statute or elsewhere for the defendant's position that to be deemed a

---

[6] Significantly, the defendant never disputed Harmony's role as a provider.

13

provider she must have provided services in every instance in which she acted fraudulently.

The jury convicted the defendant for a felony violation with respect to charge 2, knowingly submitting false claims to MassHealth for "home health services that were not provided." Following the jury's verdict, however, pursuant to Mass. R. Crim. P. 25 (b), as amended, 420 Mass. 1502 (1995), the judge reduced charge 2 to the nonprovider misdemeanor offense within the same statute. Because charge 2 related to bills for home health services that had not been rendered, the judge reasoned that the defendant could not be a "provider" for purposes of that indictment. The defendant maintains that a finding of not guilty was required because the misdemeanor offense is not a lesser included offense of the felony conviction.

Given our analysis above, we are skeptical of the judge's legal reasoning in reducing the verdict in charge 2, but conclude that the conviction was sound and the defendant is not entitled to the relief she seeks. The statute defines parallel offenses that share all the same underlying conduct and differ solely based on whether a defendant furnishes services or does not, punishing the former more harshly. G. L. c. 118E, § 40. Accordingly, the statute contains a "nonelement-creating differentiation" distinguishing an enhanced crime from its

14

misdemeanor version.  Commonwealth v. Lockwood, 95 Mass. App. Ct. 189, 197 (2019), quoting Commonwealth v. Muir, 84 Mass. App. Ct. 635, 640 (2013).  Thus, while the Commonwealth was required to show the defendant was a provider or one "who furnishes services" for purposes of the felony offense, proof of her "non-provider" status for the misdemeanor offense required no additional evidence.  See Commonwealth v. Dobbins, 96 Mass. App. Ct. 593, 595-596 (2019) (holding, in prosecution for indecent assault and battery on person who has attained age fourteen, G. L. c. 265, § 13H, age reference in statute intended to differentiate crime from same offense on child under fourteen did not create additional element); Lockwood, supra at 196-197 (in prosecution under G. L. c. 266, § 18, "no person lawfully therein being put in fear" not element of crime but "means by which to distinguish § 18 from the more serious crime" specified in G. L. c. 266, § 17, which does require proof of person "being put in fear").

3.  Motion to dismiss indictments.  For the first time on appeal, the defendant argues that the indictments should be dismissed because (1) they failed to provide "fair notice" of the offenses charged, and (2) there is a risk the grand jury indicted the defendant based on different underlying conduct from that for which she was found guilty at trial, violating art. 12 of the Massachusetts Declaration of Rights.

15

As to the first issue, the defendant has waived any claim regarding alleged deficiencies in the indictments. See G. L. c. 277, § 47A.[7] Although she filed a motion to dismiss the indictments pretrial, the defendant did not raise any claim in that motion related to what she now alleges was a lack of detail in the indictments, nor did she ever seek a bill of particulars. See Mass. R. Crim. P. 13 (b) (1), as appearing in 442 Mass. 1516 (2004).

As to the second issue, we see no risk that, due to vagueness in the indictments on charges 1 through 3, the defendant was convicted of a crime for which she was not indicted. Each of those indictments charged a "continuing course of conduct" -- that is, a scheme -- employed by the defendant to defraud MassHealth over a period of time. Commonwealth v. Sullivan, 492 Mass. 36, 37 (2023) (conviction affirmed and art. 12 satisfied where single indictment for misleading investigators about assault encompassed multiple incidents of defendant's misleading different investigators over several years). Compare Commonwealth v. Barbosa, 421 Mass. 547, 554 (1995) (conviction reversed where there was risk grand jury

---

[7] While a defendant can raise "at any time" an "objection based upon . . . the failure to charge an offense," pursuant to G. L. c. 277, § 47A, the indictments did not fail to charge the defendant with crimes for which she was later tried, as discussed below.

16

indicted and petit jury convicted defendant based on unrelated, separate acts taking place on same date). Accordingly, there was no violation of the defendant's art. 12 rights.[8]

4. Admission of search warrant affidavits and audit findings. The defendant next argues that the judge improperly allowed her to offer in evidence two search warrant affidavits and the initial audit findings of MassHealth, claiming statements therein commented on the ultimate issue.

We discern no substantial risk of a miscarriage of justice in the admission of search warrant affidavits, which were offered by the defendant. The defendant offered the affidavits to impeach the affiant, a State police trooper, with allegedly inconsistent statements. The judge gave a thorough, contemporaneous, appropriate limiting instruction to the jury. In doing so, the judge highlighted "the fact that a search warrant . . . issued is really not relevant to your consideration."[9] The judge also gave an instruction on

---

[8] The defendant's argument that, with respect to certain instances underlying charges 1 and 3, the Commonwealth failed to show services were or were not provided and therefore she may have been indicted for the misdemeanor offense in G. L. c. 118E, § 40, but convicted of the felony based on her status as a provider or nonprovider is unpersuasive given our analysis supra.

[9] There was also no substantial risk of a miscarriage of justice when, upon the admission of the second affidavit, the judge instructed the jury that they could also use the

17

inconsistent statements in his final charge.  The defendant has failed to show how these limiting instructions would not have cured any potential prejudice from the admission of the affidavits.  Accordingly, we discern no substantial risk of a miscarriage of justice.  See Commonwealth v. Lamontagne, 42 Mass. App. Ct. 213, 220 (1997) (no substantial risk of miscarriage of justice in admission of testimony where "clear and emphatic instructions . . . were quite sufficient to remind the jurors of the limited purposes of such testimony").

We similarly perceive no substantial risk of a miscarriage of justice in the admission of the audit findings within exhibit 5, the "Initial Notice of Overpayment and Notice of Sanction (Immediate Termination)."  The defendant's claim that the audit findings "repeatedly opined that Harmony billed fraudulently" is not supported by any record citation, and we found no such language in the letter.  As a program manager at MassHealth summarized in her testimony, the audit findings

> "talk[] about . . . failure to show medical need for some of these services.  It talks about some discrepancies where nurses were administering insulin to members who were not diabetic.  The plans of care were incomplete.  There were some missing pieces of documentation and indications for need for medication administration without records of such administration."

---

affidavits "for the purpose of showing the context for the seizure of the documents that have been put in evidence."

18

Therefore, not only did the findings provide context as to why MassHealth terminated Harmony as a provider and the impetus for the criminal investigation, but they simply did not touch on the ultimate issue of the defendant's guilt. Moreover, the records that were the basis of the audit findings were properly admitted and were not challenged by the defendant at trial or on appeal. Accordingly, there was no substantial risk of a miscarriage of justice. See Commonwealth v. Ortiz, 487 Mass. 602, 611 (2021) (no substantial risk of miscarriage of justice where evidence cumulative).

5. Authentication of phone calls and e-mails. The defendant claims that multiple phone calls and e-mails attributed to her were admitted without proper authentication. Because she did not object at trial, we review for a substantial risk of a miscarriage of justice. See Commonwealth v. Brum, 492 Mass. 581, 600 (2023).

"Before a communication may be admitted in evidence, the judge must make a determination regarding its authenticity; that is, the judge must determine whether there exists sufficient evidence that, if believed, a reasonable jury could find by a preponderance of the evidence that the communication in question is what it is purported to be." Commonwealth v. Lopez, 485 Mass. 471, 477 (2020). Significantly, the judge does not determine that the evidence is what it is purported to be, but

19

rather determines whether the evidence is sufficient to support such a finding.

While mere self-identification is insufficient to support a finding that statements on phone calls were made by the defendant, see Commonwealth v. Howard, 42 Mass. App. Ct. 322, 324 (1997), the Commonwealth presented more than just the defendant identifying herself in the two phone calls. Evidence about the first phone call included the testimony of a former MassHealth employee who identified a letter (exhibit 5) that preceded the phone call. The witness testified that on that call the defendant "showed signs of aggression" and told him, "[they] did not know what [they] were doing at MassHealth." The testimony made clear that the witness's interlocutor was familiar with the content of the letter, supporting the judge's conclusion that the defendant made those statements. See, e.g., Commonwealth v. Amaral, 78 Mass. App. Ct. 671, 674-675 (2011) (defendant's authorship of e-mail shown through his appearance at time and place indicated therein).

The other phone call the defendant now challenges -- the conversation in which the defendant told MassHealth that she did not have a certain income -- came after she was sent a notice from MassHealth informing her of the change in eligibility based on reported income. Like the first call, this call was tied to the defendant through content and timing, and thus there was

20

sufficient evidence to support a finding that the defendant made the statements therein. See Amaral, 78 Mass. App. Ct. at 674-675.

The evidence also included "confirming circumstances" (in addition to her name appearing as the sender) of various e-mails that the Commonwealth alleged were written by the defendant. Commonwealth v. Purdy, 459 Mass. 442, 448-449 (2011). For example, the e-mails about the immediate termination letter came after the letter was sent to the defendant, and the content of those e-mails shows the author disputing the audit findings contained in that letter. Further, the e-mail from the defendant's e-mail address beginning "[f]ollowing my conversation with our office manager . . . please find below answers on some of your questions," followed the recipient-witness's meeting with the defendant's office manager to present a records request and ask her questions about the company. Another e-mail sent from the defendant's e-mail address and received by the same witness followed a voicemail the witness had left the defendant and again pertained to the records request. The necessary "confirming circumstances" permitted the jury to conclude the defendant sent the communications within the e-mails.[10] Purdy, 459 Mass. at 448-449.

---

[10] The defendant also cites to testimony from a former employee about how the defendant would direct her by "calendar

6. Investigator's testimony. For the first time on appeal the defendant claims that testimony from a fraud investigator with the Attorney General's Office improperly "implied that patients had implicated" the defendant by confirming certain services had not been received.

In her testimony, the investigator described how she investigated the claims surrounding the defendant and Harmony by reaching out to patients and providers whose names appeared in Harmony's records. Contrary to the defendant's argument, nothing in the investigator's testimony "asked the jury to speculate or imagine evidence not before them." The investigator did not testify about any hearsay statements of the people she interviewed nor did she comment on the ultimate issue. As for the inference that can be made from the investigator's testimony that patients had not received services, this was cumulative of other evidence presented at trial. We therefore discern no substantial risk of a miscarriage of justice. See Commonwealth v. Avila, 454 Mass. 744, 763 (2009).

_____

or by e-mail" to submit claims. However, a reference merely indicating the use of e-mail does not implicate Purdy, 459 Mass. at 448-449. The defendant has also failed to show how the authenticity of a tax form admitted in evidence falls under Purdy, supra.

7.  Moffett claims.  The defendant raises multiple claims of error pursuant to Commonwealth v. Moffett, 383 Mass. 201, 208 (1981).  We address them briefly.

First, the Commonwealth did not fail to put the defendant on notice of the intent required to commit a violation of G. L. c. 118E, § 40.  The language in the indictments tracks almost verbatim the language of the statute, including that the false claims must be submitted "knowingly."  G. L. c. 118E, § 40.  With respect to her argument about preindictment delay, and even assuming there was a delay, the defendant failed to show it was intentional and prejudicial.  See Commonwealth v. Perito, 417 Mass. 674, 681-682 (1994).

We also see no merit to the defendant's argument that because she allegedly did not have a "National Provider Identifier" number, she could not have been a provider.  As previously discussed, the Commonwealth presented sufficient evidence that the defendant met the definition of a provider for purposes of G. L. c. 118E, §§ 8, 40.

Finally, the defendant has provided no legal support for her claim that the Massachusetts Limited Liability Company Act,

23

G. L. c. 156C, shielded her from responsibility for her criminal actions.

Judgments affirmed.

Orders denying motion for new
   trial and motion for
   reconsideration affirmed.

By the Court (Massing,
   Hershfang & Tan, JJ.[11]),

Clerk

Entered:  August 6, 2025.

---

[11] The panelists are listed in order of seniority.